**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARILYN FILIPOWICZ, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 C 3382 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| CAROLYN W. COLVIN, Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Marilyn Filipowicz seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). 42 U.S.C. §§ 423(d)(2). Ms. Filipowicz asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

**INTRODUCTION**

Born on December 29, 1955, Ms. Filipowicz was 57 years old at the time of the ALJ's decision. (R. 136). Under the Commissioner's regulations, she is considered "an individual of advanced age." 20 CFR §404.1563(e). That means that special rules apply to Ms. Filipowicz's case: if she is limited to light or sedentary work and has no transferable work skills, she must be found disabled. 20 CFR §404.1568(d)(4). Ms. Filipowicz worked for over 30 years as a pay phone coin collector until the job was eliminated, and she took an early retirement in 2005. (R. 34-35, 159-60). The work was rather strenuous. She had to drive around all day, collecting the coin boxes from pay phones – boxes which weighed about 60 pounds. (Administrative Record ("R") 32-35, 160). It was

considered unskilled work and, so, left her with no transferable skills. (R. 50).

Ms. Filipowicz applied for DIB on July 28, 2011, alleging that she had been disabled since October 15, 2009, due to chronic neck and back pain from arthritis in her neck, osteopenia in her spine, and osteoporosis in her hips. (R. 136-39, 167). Her application was denied initially and upon reconsideration. (R. 54-55, 68-72, 76-79). Ms. Filipowicz then filed a timely request for a hearing before an administrative law judge. (R. 80-82).

An ALJ convened a hearing on December 5, 2012, at which Ms. Filipowicz, represented by counsel, appeared and testified. (R. 26-53). In addition, Ms. Peters-Vagella testified as a vocational expert ("VE"). (R. 49). On January 11, 2013, the ALJ denied Ms. Filipowicz's application for DIB, finding that she retained the capacity to perform her past work as a pay phone coin collector.

The ALJ found that Ms. Filipowicz suffered from the following severe impairments: degenerative disc disease with myofascial pain syndrome and hypertension. (R. 18). She further found that Ms. Filipowicz did not have an impairment or combination of impairments that met or equaled a listed impairment, focusing on listing 1.04, which covers disorders of the spine. (R. 18).

The ALJ determined that Ms. Filipowicz retained the capacity to perform a full range of light work as defined in 20 CFR §404.1520(a). (R. 18). The ALJ went on to discuss the medical evidence and Ms. Filipowicz's allegations regarding her limitations. The ALJ determined that she was not entirely credible based on the medical evidence and her daily activities. (R. 19-20). The ALJ then relied on the testimony of the vocational expert to find that Mr. Filipowicz could perform her past work as a coin machine operator collector because, as it was generally performed in the national economy, it was light work which did not exceed her residual functional capacity ("RFC"). (R. 20-21). Accordingly, the ALJ found Ms. Filipowicz not disabled under the Act and not entitled to DIB.

(R. 21).

The ALJ's decision became the Commissioner's final decision on March 19, 2014, when the Appeals Council denied Mr. Filipowicz's request for review. (R. 1-6). See 20 C.F.R. §§404.955; 404.981. Mr. Filipowicz appealed that decision by filing suit in this court under 42 U.S.C. §405(g), and both parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. §636(c).

## I.

### A.

The medical record shows that Ms. Filipowicz has been seeking treatment for severe neck and back pain since at least 2009. (R. 269). Her doctor noted tenderness and limited range of motion in her neck, slowed gait, and possible nerve root impingement. (R. 269). She began receiving epidural steroid injections in December of 2009. (R. 281). She received three sets of injections in about a month and, in January 2010, she reported that her pain had decreased. (R. 279-281). But, by April 2010, Ms. Filipowicz's pain returned to its pre-injection levels. It was affecting her activities and she was using her breakthrough pain medications around the clock. (R. 264-65). In May 2010, she had a cervical nerve branch block injection. (R. 265, 278). This gave her some relief but, in June 2010 she reported that she still had to sit or lie down several times during the day to manage the pain. (R. 262). She had another cervical nerve branch block that month. (R. 277). Her neck pain decreased, but her back pain was still a problem. (R. 259). She had two more branch blocks in August 2010. (R. 275-76).

With her pain returning, as usual, just a short time after these treatments, Ms. Filipowicz's doctor sent her for an MRI of the cervical spine in October 2010. It revealed muli-level degenerative changes and reversal of the normal cervical lordosis. At C5-6, there was an osteophyte formation

3

compressing the thecal sac and causing foraminal narrowing. There was a bulging disc at C6-7, also causing compression and narrowing. There were prominent degenerative facet changes at C7-T1 (R. 254). Ms. Filipowicz had two more epidural treatments in December 2010. (R. 272-274). Her pain remained the same, but the affected areas seemed to get smaller. (R. 272).

Ms. Filipowicz continued her treatments through 2011 and 2012, with the pattern remaining about the same: relief for a bit after injections; pain returning to the previous levels thereafter. (R. 253-54, 405-06, 414-15, 421-22, 428-29, 439-40, 444-45, 449-50). She also underwent a course of physical therapy, which resulted in some improvement in range of motion and decrease of pain. (R. 313-386). Still, at the end of the regimen, she still had difficulty moving her neck, viewing a monitor, sitting, reaching for objects, and reaching overhead. (R. 385).

On August 29, 2011, Dr. Julio Pardo reviewed the file on behalf of the state disability agency and determined that Ms. Filipowicz could lift 20 pounds for a third of a workday, 10 pounds for two thirds of a workday, and stand or walk for six hours of every workday. (R. 394).

On August 1, 2012, Ms. Filipowicz's treating physician reported that she suffered from cervical degenerative disc disease, facet syndrome, myofascial pain syndrome, and osteopena. She exhibited atrophy and weakness as a result. Her condition was deteriorating. (R. 431-32). She suffered pain in her neck and back that was exacerbated by physical activity. Her medications helped manage, but did not alleviate the pain. The pain markedly interfered with her ability to concentrate on accomplishing tasks. The doctor didn't know whether she was capable of any work; that would require a functional capacity test. (R. 433-34).

Ms. Filipowicz had another cervical spine MRI that month, which showed the degenerative changes from the earlier study were unchanged. But, there was moderate to severe foraminal

4

narrowing at C5-6 with mild central canal stenosis at C5-6 and C6-7. (R. 435).

**B.**

At her hearing, Ms. Filipowicz testified that she could no longer do the kind of work she had for the phone company due to her neck and back problems. She could not stand or walk for very long – about fifteen minutes. (R. 35, 45). It gave her a pain in her neck that ran down her back and gave her splitting headaches. (R. 35). On a good day, she rated her pain at a three on a ten-point scale. On a bad day, it was an eight. She had very few good days, though; only a few each month. (R. 39). To deal with her pain she took Vicodin, Opana, Cymbalta, and Ibuprofen (600 mg). (R. 39). She also went for epidural steroid injections on a regular basis. (R. 40-41). Her activities were rather limited, and she needed help from her fiancé for anything that involved lifting. (R. 42-43). She couldn't lift more than five pounds. (R. 43). She could drive but her neck would get sore. (R. 43).

The VE identified Ms. Filipowicz's past work as "coin machine collector." The specific job Ms. Filipowicz had was heavy work and unskilled, but as generally performed in the national economy, it was considered light. The VE admitted that if an individual could only stand or walk for four hours in an eight-hour day she would not be able to perform the plaintiff's past work. (R. 50).

**II.**

**A.**
**The Standard of Review**

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a

conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

**B.**
**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether

a plaintiff is disabled:

    1) is the plaintiff currently unemployed;

    2) does the plaintiff have a severe impairment;

    3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

    4) is the plaintiff unable to perform his past relevant work; and

    5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
## Analysis

### 1.

Ms. Filipowicz has a few issues with the ALJ's decision, but we will focus on the matter of the ALJ's credibility finding, as the flaws in that determination necessitate a remand. An ALJ's credibility determination is viewed with deference and cannot be overturned unless it is "patently wrong." *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013); *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). But, if it is based on objective factors as opposed to subjective considerations like

7

demeanor, the court has greater latitude to review the decision. *Schomas*, 732 F.3d at 708; *Indoranto v. Barnhart*, 374 F.3d 470, 475 (7th Cir. 2004).[1] In this instance, the ALJ committed some errors in logic or failed to explain how the evidence led to her conclusion. In either case, her credibility determination cannot be upheld. *Indoranto*, 374 F.3d at 475; *Carradine v. Barnhart*, 360 F.3d 751, 754–56 (7th Cir.2004).

The ALJ based her credibility finding on the medical evidence, Ms. Filipowicz's account of her daily activities, her medication, and her work history. Regarding Ms. Filipowicz's daily activities, the ALJ said:

> While the claimant testified to an inability to stand or walk more than 15 minutes at a time, and noted a need for assistance in performing household chores, she is able to drive, shop for groceries and do laundry.

(R. 18). She seems to be saying that this either means she is lying or is able to work. It's not clear what the ALJ was getting at here. She has to provide a logical bridge from the evidence to her conclusion and she is far too cryptic here. *Scrogham v. Colvin*, 765 F.3d 685, 688 (7th Cir. 2014)(". . . even if we confined our review of the record to the snapshots of evidence that the ALJ considered, we do not think that this limited evidence builds the required logical bridge to her conclusions."); *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014); *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014).

We can only guess what the ALJ meant. If she was hoping to equate the ability to perform a few limited activities with a capacity for full-time work – and it does not seem as though she was

---

[1] This is also the rule in other kinds of cases. *See Kadia v. Gonzales,* 501 F.3d 817, 820 (7th Cir.2007); *Doe v. First Nat. Bank of Chicago*, 865 F.2d 864, 874 -875 (7th Cir. 1989); *Ner Tamid Congregation of North Town v. Krivoruchko,* 620 F.Supp.2d 924, 942 (N.D.Ill. 2009)(collecting cases).

– that's not an appropriate line of reasoning. The Seventh Circuit has repeatedly chastised ALJs for failing to recognize the difference between performing household chores and holding down a 40-hour-a-week job. *See Scrogham v. Colvin*, 765 F.3d at 700; *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011); *Spiva v. Astrue*, 628 F.3d 346, 351–52 (7th Cir. 2010); *Gentle v. Barnhart*, 430 F.3d 865, 867–68 (7th Cir. 2005). The difference is even more pronounced here because Ms. Filipowicz clearly testified she couldn't even perform her limited activities without help. *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013)(ALJ must take into account the fact that claimant can only perform activities with significant limitations); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009)("We have repeatedly emphasized that an ALJ is supposed to consider a claimant's limitations in performing household activities.").

Ms. Filipowicz explained that her fiancé assisted her with grocery shopping, and did the lifting. (R. 42-43). She could only manage about five pounds. (R. 43). While she said she was able to drive, she made a point of saying she couldn't do so for long. (R. 43, 45). The ALJ mentioned some of these limitations, but didn't seem to take them into account. If she did, and meant to say that grocery shopping, laundry, and driving undermined Ms. Filipowicz's allegation that she could stand or walk for no more than fifteen minutes at a time, the logical bridge just isn't there.

The ALJ also mentioned Ms. Filipowicz's medication regimen. Once again, she was cryptic. She said the fact that the regimen hadn't changed means it's working and taking care of Ms. Filipowicz's pain. Ms. Filipowicz testified that she is taking two narcotic pain relievers – Vicodin and Opana – and Cymbalta and Ibuprofen as well. (R. 39). She also regularly had injections – about every six months. Taking strong medications and undergoing a regular course of epidurals tends to bolster a claimant's credibility rather than detract from it. *Scrogham*, 755 F.3d at 701; *Carradine*

9

*v. Barnhart*, 360 F.3d 751, 755 (7th Cir.2004). Consistent with the need for continued pain medication and her entire medical history was Ms. Filipowicz's testimony that she had far more bad days – when her pain averaged an eight on a ten-point scale – than good days every month. (R. 39). Her injections provided relief for no more than a week. (R. 41).

The ALJ noted Ms. Filipowicz's long work record. Ordinarily, that would be a factor that would tend to weigh in favor of one's credibility. SSR 96–7p, 1996 WL 374186, 5; *Reed v. Colvin*, 2014 WL 3818684, 10 n.2 (N.D.Ill. 2014). But the ALJ said that "[w]hile [she] worked extensively for the same employer, she stopped working in 2005 not due to any health issues, but due to early retirement." (R. 20). Actually, Ms. Filipowicz stopped working because her job was eliminated. Pay phones went the way of the dinosaurs. She was lucky enough to have qualified for early retirement at the time. Nothing about that is inconsistent with her saying she became disabled in 2009 – four years later. Again, there's just no logical bridge here.

This leaves the medical evidence as the only support for the ALJ's credibility finding. As such, it cannot stand. In the Seventh Circuit, an ALJ may not rest her rejection of a claimant's allegations on the medical evidence alone. *Moore v. Colvin*, 743 F.3d 1118, 1125 (7th Cir. 2014); *Bjornson*, 671 F.3d at 646, 648; *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). Even if that were not the case, the ALJ made some questionable, if not wrong, assessments of the medical record. For instance, she said that there was minimal objective evidence to show any persistent pathology despite treatment. (R. 20). But the cervical MRIs demonstrated that Ms. Filipowicz's condition had deteriorated despite treatment.[2]

---

[2] While it must be conceded that the second MRI was done after Ms. Filipowicz's insured status expired, it also has to be conceded that her condition clearly had its onset well before her date last insured.
(continued...)

The ALJ also stated that at one point, ice packs were prescribed as treatment for Ms. Filipowicz's pain, insinuating that it was not very severe at all. (R. 20). For instance, she said that there was minimal objective evidence to show any persistent pathology despite treatment. (R. 20). But the cervical MRIs demonstrated that Ms. Filipowicz's condition had deteriorated despite treatment.[3] The ALJ's insinuations about ice are puzzling, to say the least. Ice is "suitable" for many things – generally to help relieve swelling and associated pain.[4] But that does not mean that it is a curative or even an effective manager of pain – especially the kind of chronic pain experienced by Ms. Filipowicz.[5] And nothing in the fact that a doctor – more likely it was the physical therapist she was seeing – prescribed ice conceivably supports the ALJ's apparent insinuation that perhaps the plaintiff's "condition" was not nearly so severe as she was claiming. Ignored were the limited utility of ice to mitigate pain, the multiple procedures she had to undergo, and the extensive regiment of strong narcotic medicines prescribed for her pain –Vicodin, Cymbalta and Ibuprofen (600 mg) – none of which were sufficient to control or eliminate her chronic pain. Thus, even if the ALJ were

---

[2](...continued)
The second MRI definitely shows that Ms. Filipowicz's condition was not, as the ALJ suggests, getting any better.

[3] While the second MRI was done after Ms. Filipowicz's insured status expired, her condition clearly had its onset well before her date last insured. The second MRI definitely shows that Ms. Filipowicz's condition was not, as the ALJ suggests, getting any better.

[4] "Heat and cold are the two most common types of noninvasive and nonaddictive pain-relief therapies for muscle and joint pain. Which one you use depends on whether the pain is new or recurring. In general, a new injury will cause inflammation and possibly swelling. Ice will decrease the blood flow to the injury, thereby decreasing inflammation and swelling. Pain that recurs can be treated with heat, which will bring blood to the area and promote healing." www.urmc.rochester.edu/encyclopedia/content.aspx?ContentTypeID=1&ContentID=4483

[5] Ms. Filipowicz testified she used ice packs regularly to deal with her headaches which she experienced several times weekly. (R.36). The headaches were the result of her pain from her chronic conditions.

allowed to rest her credibility determination on medical evidence alone – which she cannot, *Moore v. Colvin*, 743 F.3d 1118, 1125 (7th Cir. 2014); *Bjornson*, 671 F.3d at 646, 648; *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) – her credibility determination could not be upheld given her misreading of that evidence.

Finally, the ALJ claimed to have found support for her conclusions in two reports of Dr. Ira Goodman, Ms. Filipowicz's physician, both prepared on August 1, 2012. (R.20). (It should be noted that both are on preprinted forms routinely supplied by a claimant's lawyer to doctors in social security cases). The first report was entitled Musculoskeletal Defects Or Fractures Report. (Exh. 9F, R. 431). The second was captioned "Pain Report." (Exh. 10 F, R. 433). In the pain report, Dr. Goodman noted that he had been treating Ms. Filipowicz for chronic pain of long duration. He said she had cervical degenerative disease, cervical facet syndrome, myofascial pain syndrom and osteopenia. He checked the box on the form "Yes" under question 6, which asked whether the pain was "relieved" by medication. Under that, there is a line to "explain" the answer. Dr. Goodman's explanation was "medication helps manage the pain." (R. 434).

The next question asked whether therapy or medication alleviates the pain completely. Dr. Goodman answered no. He also answered the question affirmatively that asked whether the patient's pain impacted her "ability to sustain concentration and attention, resulting in frequent failure to complete tasks." (R. 434). In the pain report, Dr. Goodman stated that the claimant's pain was chronic and noted atrophy, weakness or swelling, and pain in the involved areas. He also said that the degree of pain described by the patient was reasonably related to the underlying impairments and that the patient had not had a full recovery. In fact, he noted that her condition was "deteriorating." (Exh. 10F, R. 432).

For the ALJ, these reports were of no help to Ms. Filipowicz because of what the ALJ perceived to be an internal inconsistency. The pain report stated that the plaintiff did not have acute pain. (R. 433). Why the ALJ found this significant, she did not say. Chronic and acute pain are two different very things, and Ms. Filipowicz never contended her pain was anything other than chronic.[6] Also, according to the ALJ, the pain report stated that the "medication was effective in controlling plaintiff's pain." (R.20). The pain report said no such thing. It merely noted that the medication "helps manage the pain," but was not effective in "alleviat[ing] the pain completely." (R. 434).

In short, "we do not see any conflict between the two [reports]." *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015). Fairly read, the reports and the medical records bolster rather than undercut Ms. Filipowicz's testimony regarding her chronic pain, her limited capacity to stand or walk, her need for assistance in performing household chores, and the restricted scope of her daily activities. With all deference, the ALJ's unfavorable credibility determination was influenced by a faulty reading of the record, which, in this case, requires reversal. *See Kellems,* 382 Fed.Appx. at 516.[7]

---

[6] "Acute pain begins suddenly and is usually sharp in quality. It serves as a warning of disease or a threat to the body. In most cases, acute pain does not last longer than six months, and it disappears when the underlying cause of pain has been treated or has healed. Unrelieved acute pain, however, might lead to chronic pain. Chronic pain persists despite the fact that the injury has healed. Pain signals remain active in the nervous system for weeks, months, or years. Physical effects include tense muscles, limited mobility, a lack of energy, and changes in appetite. Emotional effects include depression, anger, anxiety, and fear of re-injury. Such a fear might hinder a person's ability to return to normal work or leisure activities. *See* my.clevelandclinic.org/.../pain.../hic-acute-vs-chronic-pain. *See also* William Schiel, Pain (Acute and Chronic), http://www.medicinenet.com/ script/main/art.asp?articlekey=40842.

[7] The ALJ also found significant that in the pain report Dr. Goodman answered the question that asked whether the patient could function in a competitive work setting: "unknown, she will have to have a FCE [Functional Capacity Evaluation] to determine." (R. 434). That answer is not impeaching and does not undermine the remainder of the statements in the doctor's report. Nor is it inconsistent with anything he said in the other report. Here, all the doctor said is that before answering the question he wanted to see the results
(continued...)

4.

The VE testified that based on the Dictionary of Occupational Titles ("DOT"), Ms. Filipowicz's last job fell into the category of "coin machine collector." As performed by Ms. Filipowicz, the work was properly characterized as heavy.[8] However, as generally performed it is characterized as light work. And so, the ALJ concluded that Ms. Filipowicz was "capable of performing past relevant work as a coin machine collector as generally performed but not as actually performed." (R.20). As a consequence of this finding, Ms. Filipowicz was "disentitled to benefits." *Smith v. Barnhart*, 388 F.3d 251 (7th Cir. 2004).

The category of "coin machine collector" had a DOT number of 292.687-010. (R.20, 50). That DOT listing describes a job in which the worker collects coins from either pay phones or parking meters. http://www.occupationalinfo.org/29/292687010.html ("Collects coins or coin boxes from parking meters or telephone pay stations: Unlocks telephone faceplate and removes box containing money. Inserts empty box and locks faceplate. Tags boxes to identify pay stations. Reports malfunctioning telephones or parking meters to repair department. Delivers boxes to central depot for machine counting, tabulating, and customer payment.").

---

[7](...continued)
of an "FCE test." Just as "a claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work," *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir.2001), a doctor's statement that a plaintiff is able to work is not decisive, although it is certainly something to be considered. Here, all that Dr. Goodman said was that before making a determination about his patient's ability to function in a work setting, he wanted to see the FCE test results. As Judge Easterbrook has said in another context, "[s]o What?...Who cares?...True, but irrelevant." *Israel Travel Advis. Serv. v. Israel Iden. Tours*, 61 F.3d 1250, 1259 (7th Cir. 1995).

[8] A Vocational Expert may offer evidence within his/her expertise or knowledge concerning the demands of claimant's past work, "either as the claimant actually performed it or as generally performed in the national economy." 20 C.F.R. § 404.1560(b)(2).

"The issue is not whether Ms. Filipowicz can return to the precise job [s]he held,... but whether [s]he can return to a 'job' [s]he held that exists at other employers." *Smith*, 388 F.3d at 253. In this case, the DOT listing was last observed in 1987 – nearly *thirty years* ago.[9] We know that coin-operated pay phones have all but vanished; coin-operated parking meters are surely just about as rare. Nonetheless, in conformity with the Step 4 inquiry, the ALJ concluded that Ms. Filipowicz could return to her past relevant work and thus "is disentitled to benefits." *Id.* at 251.

But where does that work exist? Indeed, does it exist at all? The ALJ made no inquiry of the VE regarding the accuracy of the information and statistics on which the VE uncritically relied. This issue is one of concern in the Seventh Circuit. Here is how the court phrased it in *Voigt v. Colvin*, 781 F.3d 871 (7th Cir. 2015):

But in making this observation, the ALJ seemingly put out of mind the fact that she was also treating with narcotics and repeated epidural injections and nerve blocks. Even if she were allowed to rest her credibility determination on medical evidence alone, findings like these would undermine it. Accordingly, the ALJ's credibility determination cannot be upheld and this case must be remanded to the Commissioner. Accordingly, this case must be remanded to the Commissioner.

---

[9] In the DOT, "DLU" denotes the "date last updated", which is intended to "allow[] the reader to identify the currency of each definition." http://www.occupationalinfo.org/front_223.html.

That being said, it is worthwhile to make a point about the ALJ's finding that, given a capacity for light work, Ms. Filipowicz could return to her past work. Obviously, her specific former job position does not exist anymore. That's why she took early retirement. Even if it did, she couldn't do it because it was heavy work. The vocational expert – upon whom the ALJ relied – testified that, based on the Dictionary of Occupational Titles ("DOT"), Ms. Filipowicz's past work fell into the category of "coin machine collector" which had a DOT number of 292.687-010 and was generally performed as light work. (R. 20, 50). That DOT listing describes a job in which the worker collects coins from either pay phones or parking meters. http://www.occupationalinfo.org/29/292687010.html ("Collects coins or coin boxes from parking meters or telephone pay stations: Unlocks telephone faceplate and removes box containing money. Inserts empty box and locks faceplate. Tags boxes to identify pay stations. Reports malfunctioning telephones or parking meters to repair department. Delivers boxes to central depot for machine counting, tabulating, and customer payment."). The entry for this position indicates that it was last observed in 1987 – nearly *thirty years* ago.[10] We know that coin-operated pay phones have all but vanished; coin-operated parking meters are surely just about as rare. The ALJ found Ms. Filipowicz could return to her past work, but where does that work exist? Does it exist at all?

This issue has drawn the critical attention of the Seventh Circuit over the last couple of years. *See Voigt v. Colvin*, 781 F.3d 871 (7th Cir. 2015); *Herrmann v. Colvin*, 772 F.3d 1110, 1113 (7th Cir. 2014)("If the only jobs that the applicant is physically and mentally capable of doing no longer exist in the American economy (such as pin setter, phrenologist, leech collector, milkman, pony

---

[10] In the DOT, "DLU" denotes the "date last updated", which is intended to "allow[] the reader to identify the currency of each definition." http://www.occupationalinfo.org/front_223.html.

express rider, and daguerreotypist), the applicant is disabled from working, and likewise, as a realistic matter, if there is an insignificant number of such jobs."); *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014).[11] The gist of these opinions is that the DOT is an outdated catalog of jobs, with many entries dating back nearly 40 years. Even when in step with the times, it seems the DOT is not an accurate portrayal of the numbers of jobs that exist in its various categories. And so, who can say that there is a "coin machine collector" position for Ms. Filipowicz to return to?

Unfortunately, in the end, it doesn't matter if there is, for a draconian aspect of the system dictates that if an individual is capable of performing their past work, they are not disabled even if that work no longer exists. *Barnhart v. Thomas*, 540 U.S. 20 (2003); *Smith v. Barnhart*, 388 F.3d

---

[11] This is how the Court phrased it in *Voigt*:

> The administrative law judge said that "the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles," but as we and others have explained, the DOT does not contain information on which to base an estimate of the number of available jobs of a particular kind. [citations omitted]. As we said in the *Browning* case [*Browning v. Colvin*, 766 F.3d 702 (7th Cir. 2014)], we "have no idea what [is] the source or accuracy of the number of jobs that vocational experts (including the one in this case, whose estimates the administrative law judge accepted without comment) claim the plaintiff could perform that exist in the plaintiff's area, the region, or the nation. There is no official source of number of jobs for each job classification in the *Dictionary of Occupational Titles*, and while there are unofficial estimates of jobs in some categories, the vocational experts do not in general, and the vocational expert in this case did not, indicate what those data sources are or vouch for their accuracy. And many of them estimate the number of jobs of a type the applicant for benefits can perform by the unacceptably crude method of dividing the number of jobs in some large category (which may be the only available data) by the number of job *classifications* in the category, even though there is no basis for assuming" that there is the same number of jobs in each narrow category. 766 F.3d at 709 (emphasis added). There is no indication that the estimate of the number of jobs that the applicant in this case could fill (if the administrative law judge's estimate of his capacity to work is correct, as it may very well not have been) is any more accurate than it was in *Browning.*

251, 252 (7th Cir. 2004). And so, Judge Posner's "pin setter, phrenologist, leech collector, milkman, pony express rider, and daguerreotypist" are all out of luck. *Herrmann*, 772 F.3d at 1113. They are not disabled because they can return to their non-existent past relevant work.

This may seem like no more than an idle musing but it is meant to lead us back to the point made at the outset. Given Ms. Filipowicz's age, lack of transferable skills, and limitation to light work, the Commissioner's Medical-Vocational Guidelines, or "Grid," would direct a conclusion that she is disabled. Hence, the only way she could be found not disabled was for the ALJ to find she could return to her past work. But the only indication in the record that there is such a thing as her past work is an obsolete listing of jobs. All this tends to bring the ALJ's decision under a scrutiny that tends toward the suspicious – a scrutiny the ALJ's decision was not able to withstand.

## CONCLUSION

The plaintiff's motion for remand [Dkt. #12] is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

**ENTERED:** _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 9/16/15